UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| DAVID SUTHERLAND, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:15-cv-01110-TWP-MJD |
| ) | |
| CAROLYN W. COLVIN, Acting Commissioner ) | |
| of the Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff David Sutherland ("Sutherland") requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"). For the following reasons, the Court **AFFIRMS** the decision of the Commissioner.

### I.    BACKGROUND

**A.    Procedural History**

On February 24, 2012, Sutherland filed applications for DIB and Supplemental Security Income ("SSI"), alleging a disability onset date of December 31, 2002. The SSI claim was denied on March 2, 2012, and the DIB claim was denied on March 29, 2012. Sutherland did not pursue the appeals process of these denials. However, on July 18, 2012, Sutherland filed another application for DIB only, again alleging a disability onset date of December 31, 2002, and complaining of back, neck, and leg pain, anxiety, depression, and obesity. His claims were initially denied on August 29, 2012, and again on reconsideration on October 18, 2012. Sutherland filed a written request for a hearing and on June 5, 2014, a hearing was held before Administrative Law

Judge Ronald T. Jordan ("the ALJ").  Jennifer L. Carril, an impartial vocational expert, appeared and testified at the hearing.  Sutherland was represented by counsel, Frank Hanley, II. On June 17, 2014, the ALJ denied Sutherland's application for DIB.  Following this decision, Sutherland timely requested review by the Appeals Council.  On May 12, 2015, the Appeals Council denied Sutherland's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Thereafter, Sutherland filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.     Factual Background**

At the time of his alleged disability onset date, Sutherland was 48 years old, and he was 60 years old at the time of the ALJ's decision.  Sutherland is now 62 years old.  Sutherland completed his high school education.  Prior to the onset of his alleged disability, Sutherland had an employment history of working as a real estate agent.  He also spent time working at a restaurant that he and his wife co-owned.  He continued working at the restaurant after the alleged disability onset date of December 31, 2002, until February 2010 when he was involved in an automobile accident. The business stopped running in December 2010 after it burned down. (Filing No. 10-6 at 10).

Sutherland and his wife opened their restaurant in June 2001.  He worked at the restaurant and made almost all of the management decisions, performed bookkeeping, and some physical activities (Filing No. 10-6 at 14).  He worked at the restaurant approximately seventy hours per week, or two hundred eighty hours per month.  *Id.* at 10.  Sutherland's work included ordering supplies, checking in deliveries, unloading supplies, and socializing with customers (Filing No. 10-2 at 39; Filing No. 10-6 at 14).  He frequently lifted one to two pounds and sometimes lifted ten to fifteen pounds (Filing No. 10-6 at 55).

2

On October 15, 2001, Sutherland was approximately 5' 7" tall and weighed 320 pounds. Because of his morbid obesity, Sutherland underwent a Roux-en-Y gastric bypass surgery ([Filing No. 10-7 at 33](#)). In January 2002, approximately three months after the surgery, Sutherland weighed 253 pounds. In January 2004, Sutherland weighed 205 pounds, down 115 pounds from his weight before surgery. *Id.* In October 2007, Sutherland weighed 215 pounds. *Id.*

Sutherland was experiencing weakness in his right quadriceps and iliopsoas, so he received an MRI of his pelvis on June 6, 2003. The MRI revealed mild degenerative changes at the L4-S1 levels of the spine. The MRI also revealed an anterior abdominal soft tissue mass, suggesting a possible umbilical hernia ([Filing No. 10-7 at 56](#)).

Sutherland went to John T. Cummings, M.D. ("Dr. Cummings"), a neurosurgeon, to address the degenerative changes in his spine, which were manifested through back and neck pain. On July 17, 2003, Dr. Cummings performed a posterior lumbar interbody fusion at L4-L5 and L5-S1 to address Sutherland's degenerative changes ([Filing No. 10-7 at 41](#)).

Sutherland returned to Dr. Cummings for a six-month follow-up appointment after the fusion surgery at L4-L5 and L5-S1. Dr. Cummings noted that Sutherland was not experiencing significant back pain at the time of the surgery but that he had been suffering from his right leg not supporting him and giving way, leading to falling down. At the time of the follow-up appointment, Dr. Cummings noted that Sutherland's leg was feeling fine and much stronger, with only an occasional fall, but Sutherland was now experiencing back pain at the end of each day. He was able to bend over to touch his toes, but extension caused his back to go into spasms. Dr. Cummings recorded that there was remodeling of the bone grafts, but the fusion did not appear to be solid. However, the instrumentation was in proper orientation. Dr. Cummings recommended that

Sutherland add Soma to his medicine regimen to help with the back pain, and he also recommended that Sutherland start physical therapy (Filing No. 10-7 at 10).

On January 15, 2004, a CT scan of Sutherland's abdomen was taken because he was experiencing abdominal pain. The CT scan revealed the presence of abdominal mesh, which was present because of two prior hernia surgeries, and the reviewing doctor suspected a prior Roux-en-Y gastric bypass surgery. Sutherland's organs looked unremarkable, and there was a small lesion on the liver, indicating a possible simple cyst (Filing No. 10-7 at 34).

Because of back pain and Dr. Cummings' recommendation, Sutherland participated in physical therapy at Advanced Physical Therapy in Indianapolis, Indiana. He made improvements throughout his physical therapy sessions and partially met his goals. On February 16, 2004, at his eighth physical therapy session, Sutherland reported that his pain level was at a two on a scale from one to ten when he was at rest and at a six when he was performing activities. He was not able to bend to the right or left, and his range of motion with extension was limited to 60%; however, he was able to bend forward and touch the floor. Sutherland's treatment included hot and cold packs, electrical stimulation, and therapeutic exercise. The physical therapist noted that Sutherland was "overall improved," with decreased endurance but increased exercise tolerance. The physical therapist also noted that Sutherland was able to perform his work duties with some pain, and he was "working full duty but with pain/difficulty." (Filing No. 10-7 at 4.)

On November 17, 2004, Sutherland returned to Dr. Cummings for a one-year follow-up appointment after the fusion surgery at L4-L5 and L5-S1. Sutherland wore a leg brace to the appointment because his leg was giving out underneath him, leading to falling. His right quadriceps had some residual atrophy. Dr. Cummings noted that Sutherland was for the most part asymptomatic, and he was "working at his restaurant without limitations and he will have

4

occasional back spasms. He has been taking some anti-inflammatories but otherwise has gotten along quite nicely." (Filing No. 10-7 at 9.) Sutherland's x-rays indicated excellent remodeling of the bone grafts, with some lucency around the bone graft despite the remodeling. Dr. Cummings opined that the fusion was solid and stated that Sutherland was doing well clinically. *Id.*

Because of arthritis in his left knee, Sutherland underwent a total knee arthroplasty on August 8, 2006 (Filing No. 10-7 at 45). Sutherland continued suffering from neck, back, and leg pain in 2009 and 2010, so Dr. Cummings performed two additional surgeries to address the pain (Filing No. 10-8 at 98–99; Filing No. 10-8 at 103).

Whenever Sutherland underwent a surgery, he would reduce his work load at the restaurant for a period of months during his recovery. However, he stopped working after he was involved in an automobile accident on February 4, 2010 (Filing No. 10-6 at 4, 10; Filing No. 10-8 at 100). Sutherland was stopped at a red light when somebody rear-ended him driving approximately thirty miles per hour. Sutherland hit his head on the steering wheel and was thrown backward. The accident resulted in numbness and weakness in Sutherland's left arm as well as neck pain and limited range of motion in his neck (Filing No. 10-8 at 100).

Throughout 2010, 2011, and 2012, Sutherland continued to experience neck, back, and leg pain, and MRIs and x-rays revealed some stenosis, a bulging disk, and degenerative changes. He received spinal injections and narcotic pain medications to help control the pain. He began using a walker, and his gait was visibly abnormal.

Sutherland began seeing a family physician, Mary Catherine Yoder, M.D. ("Dr. Yoder"). Dr. Yoder treated Sutherland for various complaints such as his neck and back pain and high blood pressure. His high blood pressure was effectively managed with medication, and Dr. Yoder noted throughout her treatment notes that Sutherland was receiving steroid injections for pain.

5

In November 2010, Dr. Yoder noted that there were concerns that Sutherland's symptoms were out of range of his actual objective signs and that he was possibly suffering from a somatoform disorder as well as depression (Filing No. 10-8 at 71). On August 2, 2011, Dr. Yoder noted that Sutherland's back pain seemed to be getting a little better. *Id.* at 48. On January 13, 2012, Dr. Yoder updated Sutherland's medication for right hip pain and noted that he was doing much better and had full range of motion and no instability in his right hip. *Id.* at 39. At his office visit with Dr. Yoder on January 27, 2012, Sutherland's legs were doing better, his hip was doing well, and his balance was better. Dr. Yoder noted that Sutherland had spinal and cervical stenosis, but he seemed to be stable. *Id.* at 35. In October 2012, Sutherland reported having a lot of pain down his right leg with lower back and neck pain. He had decreased range of motion in his back. *Id.* at 27.

To assist Sutherland in the DIB application process, Dr. Yoder completed a "medical statement of physical abilities/limitations for Social Security disability claim" on April 8, 2013 (Filing No. 10-7 at 64–65). Dr. Yoder reported that Sutherland had problems with balance and falling, had troubles with dropping items and lifting his arms above his heard, and had constant pain, which she rated as moderately severe. Dr. Yoder opined that Sutherland could rarely bend or stoop, raise his arms above his shoulder, and work near dangerous equipment. She opined that Sutherland could frequently lift five pounds and occasionally lift ten pounds. Dr. Yoder further opined that Sutherland could stand or sit for fifteen minutes at a time, and he could stand for two hours in an eight-hour work day and sit for four hours in an eight-hour work day. *Id.*

In October and December 2013, Sutherland's pain management physician noted that he was doing "fairly well" and "remain[ed] functional." His situation was stable, and his medications

were helping.  He had a negative straight leg raise test, and he reported pain of 2 out of 10 (Filing No. 10-8 at 106–07).

Treatment notes show that Sutherland received counseling from Dr. Randall Patee because of depression from June 2012 through September 2013.  He met with Dr. Patee fairly consistently during the fifteen months (Filing No. 10-7 at 66–85).  Sutherland's family physician, Dr. Yoder, noted in her progress notes starting in 2010 that Sutherland was taking medication for anxiety and depression.

During the administrative hearing before the ALJ, Sutherland testified that he had worked as a real estate agent for an agency and then opened a family restaurant with his wife.  He explained that the restaurant went out of business in 2010, but before it went out of business, he "really didn't do anything" at the restaurant (Filing No. 10-2 at 38).  When the ALJ questioned Sutherland about the report he completed for the DIB application wherein he stated that he worked seventy hours a week at the restaurant, Sutherland asserted that he was heavily medicated and not thinking correctly at the time he filled out the report.  *Id.* at 38–39.  Sutherland then testified that he probably stopped working at the restaurant in 2006.  He testified that, at that time, he was probably working twenty hours a week and only completing paperwork and socializing with customers.  *Id.* at 39.  Sutherland also testified that his doctors told him that he should not lift more than eight pounds but that he can comfortably lift eight pounds.  *Id.* at 42.

## II.    DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to DIB only after he establishes that he is disabled.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, he is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then his residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given his RFC and considering his age, education, and past work experience. 20 C.F.R.

§ 404.1520(a)(4)(v). The claimant is not disabled if he can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700

(7th Cir. 2004).

### III. THE ALJ'S DECISION

The ALJ first determined that Sutherland met the insured status requirement of the Act for DIB through September 30, 2005. The ALJ then began the five-step analysis. At step one, the ALJ found that Sutherland had not engaged in substantial gainful activity since December 31, 2002, the alleged disability onset date, through his date last insured of September 30, 2005. The ALJ noted that, while Sutherland worked at his restaurant nearly seventy hours a week from June 2001 through February 2010, no income was ever reported so this work did not qualify as substantial gainful activity. At step two, the ALJ found that Sutherland had the following severe impairments: disorders of the spine and obesity. At step three, the ALJ concluded that through the date last insured, Sutherland does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that through the date last insured, Sutherland had an RFC to perform light work with the following additional limitations:

> [H]e can lift, carry, push or pull twenty pounds occasionally and ten pounds frequently. He can stand and walk six hours in an eight-hour workday and sit for six hours in an eight-hour workday. He can occasionally stoop, balance, crouch, kneel, crawl and climb stairs or ramps. He should not climb ladders, ropes, or scaffolds or work around hazards such as unprotected heights or unguarded moving machinery. Lastly, he should not ambulate on wet or uneven surfaces.

(Filing No. 10-2 at 21–22.)

At step four, the ALJ determined that Sutherland was unable to perform his past work as a real estate agent through the date he was last insured because the demands of his past relevant work exceeded his RFC. At step five, the ALJ determined that Sutherland was not disabled through the date he was last insured because there were jobs that existed in significant numbers in

the national economy that Sutherland could perform, considering his age, education, past work experience, and RFC. Therefore, the ALJ denied Sutherland's application for DIB because he was not disabled.

### IV.   DISCUSSION

In his request for judicial review, Sutherland, a *pro se* plaintiff, argues in conclusory fashion that he believes he qualifies for DIB because of his "many severe impairments." ([Filing No. 14 at 1](#).) Sutherland explains that the ALJ even noted that his impairments are severe. Then he asserts that his severe impairments prevent him from "being able to function normally and from being able to hold down gainful employment." *Id.* He describes in detail his experience of pain and how it affected his ability to help at the family restaurant. Then he perfunctorily repeats the five-step disability process and asserts he is entitled to DIB. Sutherland begins by asking,

> Q1. Is the claimant presently unable to perform any substantial gainful activity?
>
> A1. I am unable to perform any substantial gainful activity due to the following conditions but not limited to the conditions.
> 1. Anxiety
> 2. Arthritis
> 3. Back – severe lower back pain at L4-5 and L5 S1 levels
> 4. Spinal stenosis lumbar
> . . .

(*Id.* at 1–2.)

> Q2. Is the claimant's impairment severe?
>
> A2. Yes, very much so. I suffer from multiple severe impairments.

(*Id.* at 2.)   Sutherland points to Dr. Cummings' operative note where the doctor states that Sutherland's stenosis and radiculopathy is "severe." ([Filing No. 14-2 at 1](#).)   He also points to another doctor's note that says his back is "a mess." ([Filing No. 14-3 at 1](#).)  Sutherland also notes that the ALJ found that his impairments were severe ([Filing No. 14-1 at 1](#)).

Next, Sutherland asserts, "Q3. Does the impairment or combination of impairments meet or exceed one of a list of specific impairments?" (Filing No. 14 at 2.) Sutherland answers that his physical and mental impairments "meet or exceed one of a list of specific impairments" because the impairments that he listed in response to his first question are "severe." *Id.* Sutherland did not address the RFC determination, and then he asks, "Q4. Is the claimant unable to perform her (his) former occupation?" And he responds, "Yes, I am unable to perform my former occupation and any other type of occupation." *Id.* He points to Dr. Yoder's 2013 opinion about his functional limitations.

Finally, Sutherland inquires, "Q5. Is the claimant unable to perform any other work within the economy in light of age, education and prior work experience?" He answers, "Yes, I am unable to perform any other work due to the severity of my physical and mental conditions." *Id.* at 3. Sutherland concludes by asserting that the possible physical requirements of the three jobs that the ALJ determined he could perform—night cleaner, labeler, and price marker—exceed his ability to perform work.

As an initial matter, because Sutherland is proceeding *pro se,* the Court has liberally construed his pleadings. Trial courts should ensure *pro se* litigant claims are given "fair and meaningful consideration." *Madyun v. Thompson*, 657 F.2d 868, 876 (7th Cir. 1981). Accordingly, *pro se* plaintiffs' pleadings are liberally construed. *Caruth v. Pickney*, 683 F.2d 1044, 1050 (7th Cir. 1982). Sutherland fails to advance any specific arguments regarding how the ALJ's decision was legally erroneous or how it was not supported by substantial evidence thereby necessitating remand or reversal of the decision to deny disability. Because of this failure, the Court will address the standard of whether substantial evidence supports the ALJ's findings and

decision and whether there is any legal error. *See Dixon*, 270 F.3d at 1176. Before doing so, the Court briefly addresses some concerns that are implicitly raised in Sutherland's brief.

First, that a physician uses the term "severe" when describing in his medical notes the condition of his patient is inapposite to the legal question under the Social Security regulations of whether an impairment is "severe." The level of severity of an impairment under the Social Security regulations is a determination that is made by the ALJ based on the medical evidence and considers whether the impairment significantly limits the person's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521. A doctor's label of "severe" without more, is insufficient. Despite this, the ALJ in this case found that Sutherland's obesity and spine problems were severe impairments.

Similarly, a doctor's statement about disability is not outcome determinative and is not entitled to any weight because the question of disability is reserved for the Commissioner alone. Disability is a legal matter decided by the Commissioner, not by a treating physician. *See* 20 C.F.R. § 404.1527; *see also Lennon v. Chater*, 1996 U.S. App. LEXIS 15420, at *5–6 (7th Cir. June 25, 1996) ("whether that [impairment] constituted a disability within the meaning of the Social Security Act is a *legal* determination for the ALJ to make").

Lastly, the determination that an impairment is "severe" at Step 2 does not equate to a determination at Step 3 that the impairment meets or medically equals any impairment that appears in the Listing of Impairments. An ALJ's analysis at Step 3 of the disability determination does not end at the question of whether the impairment is severe. If such were the case, the five step sequential evaluation would resolve the impairment question at Step 2—whether an impairment is severe—and then skip Step 3 and go to the RFC determination and Steps 4 and 5. Rather, the ALJ

looks at the evidence to determine whether the impairment meets or medically equals each of the elements of a listed impairment found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

Turning to the ALJ's decision in this case, the Court considers whether substantial evidence supports the ALJ's findings and decision and whether there is any legal error. The timeframe at issue is limited to December 31, 2002, the alleged disability onset date, through September 30, 2005, the date that Sutherland last met the insured status requirement of the Act for DIB. As the Commissioner correctly points out, Sutherland must establish that he was disabled on or before September 30, 2005, his date last insured, in order to be entitled to DIB. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); *Allord v. Astrue*, 631 F.3d 411, 416 (7th Cir. 2011).

At Step 1, the ALJ determined that Sutherland had not engaged in substantial gainful activity after his disability onset date through his date last insured because no income was ever reported on his earnings reports that were submitted with his application for DIB. While Sutherland reported that he worked seventy hours a week from June 2001 to February 2010, the ALJ gave Sutherland the benefit of continuing the sequential evaluation process because of the lack of reported income.

At Step 2, the ALJ determined that Sutherland had severe impairments of disorders of the spine and obesity based on the medical records that were submitted as evidence. These records indicated impairments that were more than a slight abnormality and had more than a minimal effect on Sutherland's ability to perform basic functional activities. The ALJ considered the evidence of Sutherland's knee surgery in 2006 and his degenerative joint disease of the knee but determined that there was no evidence that it limited Sutherland's ability to work prior to September 30, 2005, and thus it was not a severe impairment.

The ALJ also considered Sutherland's claims of anxiety and depression but noted that they were not medically determinable impairments because there was no evidence of anatomical, physiological, or psychological abnormalities shown by clinical and laboratory diagnostic techniques. There was no evidence of depression or anxiety during the relevant time period. The first mention of any mental impairment appeared in the record in 2010, approximately five years after the date last insured (Filing No. 10-8 at 91). Therefore, the ALJ determined that Sutherland's anxiety and depression were not medically determinable impairments. The ALJ's determinations of severe and non-severe impairments were based on the medical records and thus were based on substantial evidence.

At Step 3 of the disability determination, the ALJ considered Sutherland's back, neck, and leg pain and impairments under Listing 1.04, disorders of the spine. The ALJ determined that, through the date last insured, Sutherland did not have the significant and persistent neurological abnormalities that the listing required. The ALJ explained that there was no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an inability to ambulate.

In order to meet or medically equal the listed impairment at Listing 1.04, a claimant must provide medical evidence that establishes all of the criteria specified in the listed section. The criteria for Listing 1.04 are found at 20 C.F.R. Part 404, Subpart P, Appendix 1. In order for an impairment to meet or medically equal Listing 1.04, a claimant must show:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by

15

>sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
>or
>
>B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
>or
>
>C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

While the Court may not reweigh the evidence or substitute its judgment for that of the ALJ, the Court reviewed the record evidence to determine whether the ALJ ignored evidence that could support a finding of disability under Listing 1.04. In its review of the evidence, the Court could not find any evidence in the record of a compromise in any nerve roots or the spinal cord during the relevant time period that would raise Sutherland's back, neck, and leg impairments to the level of Listing 1.04. Thus, the ALJ's decision regarding Listing 1.04 is appropriate.

The ALJ also considered Sutherland's obesity at Step 3 in conjunction with musculoskeletal, respiratory, and cardiovascular impairments under Listings 1.00Q, 3.00I, and 4.00F, and he determined that Sutherland's obesity by itself or in combination with other impairments did not meet or medically equal a listed impairment. Again, a review of the record evidence supports this conclusion. The ALJ's discussion at Step 3 appears to be brief because of the lack of evidence in the record to support any listed impairment. However, the ALJ provides more detailed analysis of the limited evidence when determining Sutherland's RFC. The ALJ did not err at Step 3 of the disability evaluation.

When determining Sutherland's RFC, the ALJ considered the objective medical evidence in the record concerning his back, neck, leg, and knee limitations as well as his obesity. The ALJ reviewed and discussed the treatment notes of Sutherland's doctors and surgeons. He considered and discussed the progression and regression in Sutherland's symptoms of pain. The ALJ considered and discussed Sutherland's various treatments: surgeries, injections, pain management medications, and physical therapy. The ALJ considered and discussed Sutherland's significant weight loss after the gastric bypass surgery. He considered and discussed x-ray and MRI findings that showed some degenerative changes but also objective improvement in Sutherland's condition.

The ALJ also took into consideration Sutherland's medications and their effectiveness and side effects. He considered the fact that Sutherland always was able to return to work after surgeries and treatment. He considered Sutherland's statements to his doctors that he had returned to work. The ALJ also considered and discussed Sutherland's inconsistent statements in the record and during the hearing to discount the reliability of Sutherland's testimony regarding the extent of his limitations. The ALJ noted that he considered reports from Sutherland and his wife regarding his limitations, but the reports were given little to no weight because they related to limitations in 2012 rather than before the date last insured. Furthermore, the ALJ discussed Dr. Yoder's opinion from April 2013 and noted that it gave no indication that there were disabling conditions before September 30, 2005, the date last insured. Based on the medical evidence and the other evidence in the record, the ALJ limited Sutherland to light work with additional postural and safety restrictions. This RFC determination was supported by substantial evidence, and Sutherland failed to show otherwise.

Finally, at Steps 4 and 5 of the disability evaluation, the ALJ presented to the impartial vocational expert a hypothetical that directly matched Sutherland's RFC determination. The

vocational expert testified that the hypothetical individual with Sutherland's RFC would not be able to perform his past work as a real estate agent because it would require ambulating on wet or uneven surfaces. However, the vocational expert testified that the individual with this specific RFC could perform work as a night cleaner, labeler, or price marker, and these jobs existed in significant numbers. The vocational expert testified that her testimony was consistent with the Dictionary of Occupational Titles, and Sutherland did not challenge the reliability of her testimony. The ALJ based his decision on the vocational expert's opinion, and at Step 5, he determined that Sutherland was not disabled because he could perform work as a night cleaner, labeler, or price marker with his RFC. Thus, the ALJ's determinations at Steps 4 and 5 also were supported by substantial evidence.

Because each step of the disability evaluation was supported by substantial evidence, the Court determines that reversal and remand are not warranted.

## V.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**. Sutherland's appeal is **DISMISSED**.

**SO ORDERED.**

Date: 9/16/2016

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

David Sutherland
4128 South Carrie Drive
New Palestine, Indiana  46163

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov